**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

IN RE:                                                    :
                                                          :
IN THE MATTER OF                          :          CIVIL ACTION NO. 22-CV-117
$12,000.00 U.S. CURRENCY             :

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

NOW INTO COURT COMES Plaintiff, United States of America, by and through undersigned counsel, who alleges the following:

**NATURE OF THE ACTION**

1.        This is a civil action *in rem* to forfeit to the United States $12,000.00 in U.S. Currency (the "defendant property") representing moneys furnished or intended to be furnished by any person in exchange for a controlled substance, or proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate a drug offense, in violation of the Controlled Substances Act, 21 U.S.C. § 841 *et seq*.  Therefore, pursuant to 21 U.S.C. § 881(a)(6), the defendant property is subject to forfeiture to the United States of America.

2.        The defendant property was seized on October 12, 2021, on Interstate 12 westbound near Millerville Highway, mile marker 5, in Baton Rouge, Louisiana, and is in the custody of the United States Marshals Service.

**JURISDICTION AND VENUE**

3.        The United States brings this action in rem in its own right to forfeit and condemn the defendant property.  This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a) and 21 U.S.C. § 881.

4.        This Court has in rem jurisdiction over the defendant property under 28 U.S.C.

§ 1355(b).   Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant in rem pursuant to Supplemental Rule G(3)(b), which the United States will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(b) & (c).

5.      Venue is proper in this district, pursuant to 28 U.S.C. § 1355(b)(1), because acts or omissions giving rise to the forfeiture occurred in this district, pursuant to 28 U.S.C. § 1395.

## THE DEFENDANT IN REM

6.      The defendant property consists of the following:

$12,000.00 in U.S. currency seized on October 12, 2021, on Interstate 12 westbound near mile marker 5, near Millerville Highway in Baton Rouge, Louisiana (the "defendant property").

## FACTS

7.      On Tuesday, October 12, 2021, Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Christopher Green was patrolling the I-12 corridor in East Baton Rouge Parish, Louisiana.   At approximately 1:50 p.m., TFO Green observed a Chevrolet Traverse travelling westbound on I-12 following too closely behind a pick-up truck.   Based on TFO Green's training and experience, he believed that the Chevrolet Traverse was travelling at an unsafe distance from the truck in front of it, and, consequently, Officer Green stopped the vehicle on I-12 westbound near the Millerville Highway Exit, mile marker 5.

8.      After stopping, TFO Green approached the Chevrolet Traverse on the passenger's side to speak with the driver.   The driver handed TFO Green a Georgia driver's license, which identified him as Eddie Leary.   As the driver handed over the license, TFO Green observed the driver's hands shaking, and he also appeared to be sweating on his top lip.   While TFO Green stood at the passenger-side window, he observed the passenger, later identified as Alvera

Buchanan, who appeared to be extremely nervous.   He was able to see her pulse beating strongly in her neck, which he found odd since the passenger should have no concern of receiving a ticket.

9.        Officer Green asked Leary to step out of the vehicle, and once Leary complied, TFO Green began asking him questions.   Leary initially indicated the passenger was his wife and she had rented the vehicle the night before about 10:30 p.m.   He said they were coming from Atlanta and heading to Texas for a cousin's birthday party in Texas.   When TFO Green asked who the birthday party was for, Leary stated it was for his girlfriend's sister, recanting the prior statement that the passenger was his wife.   During questioning, TFO Green detected some indications of deception.

10.      Upon further questioning, Leary was unable to specify where in Texas they were heading, even after Officer Green asked if it was Dallas, Houston, or San Antonio.   When asked how long they would be there, Leary advised they would be returning to Atlanta in two or three days.   TFO Green found this to be a non-specific answer and, based on his training and experience, found that such a lengthy trip with such a quick turn-around was consistent with possible criminal behavior.

11.      Next, TFO Green spoke with Buchanan.   She stated they were driving to Texas City to meet Leary's friend.   When Officer Green asked if she had any family or friends there, she said "no."   Her statements contradicted Leary's accounting of their trip.   Buchanan said they would be returning to Atlanta the following day because the rental car was due back.   This confirmed a quick turn-around trip, indicative of possible criminal activity.

12.      After questioning Buchanan, TFO Green returned to the driver and asked if he had ever been arrested.   Leary responded that he was arrested for murder in 1986 and that he was on parole.   TFO Green then advised Leary that he was going to perform checks on his driver's license

3

and on the vehicle.  While doing this, TFO Green also contacted a K-9 Sheriff's Deputy for backup because he felt that criminal activity was occurring based on his 28 years of experience in law enforcement, including working Interstate Criminal Enforcement for 13 years.   TFO Green's suspicions of criminal activity were based on several factors, including the nervous behavior of the occupants, the deceptions observed, the quick duration of the trip, and that the origin and destination cities were known drug source areas.

13.     Once the back-up units arrived, TFO Green returned to question Leary about the vehicle, the responsibility of the items within it, and the possibility of any currency being in the car.  Leary stated that Buchanan had rented the vehicle at about 10:30 p.m. the night before, and that they had left Atlanta about 6:00 a.m. that morning.   When questioned about any items in the car, Leary initially indicated he didn't have anything but after additional questioning changed his response to "I really can't say."   TFO Green also asked Leary about the amount of money he was traveling with on that day and he responded that whatever Buchanan had in her purse.   When questioned about a specific amount, such as $30,000 or $50,000, Leary advised that they didn't have that kind of money.

14.     TFO Green explained that he observed deception in Leary's story and, thus, asked for and received consent to search the vehicle.   TFO Green questioned Leary about any compartments in the car, if any of the panels had been removed, if Leary had been in the spare tire compartment or the engine compartment, to which Leary responded no.   When asked again if there were any large amounts of money in the car, Mr. Leary stated, "Not that I know of."   From his experience, TFO Green knew this was a common response from people who are smuggling contraband.   When asked about any rubber-banded money, Leary told TFO Green that he didn't

4

know anything about that.    Again, based on his training and experience, TFO Green found Leary's answers to be evasive and deceptive.

15.    Next, TFO Green returned to Buchanan, the renter of the vehicle.   She confirmed the car had been rented the night before.   She also said that no one else had been in the car since she rented it.   When asked if she was responsible for everything in the vehicle, she said, "Yes." Buchanan denied having any large amounts of money or rubber-banded money hidden anywhere in the vehicle.   After further conversation, Buchanan did not appear to consent voluntarily, so TFO Green initiated a dog sniff while back-up units continued to perform checks of the driver, passenger, and vehicle.

16.    The K-9, named Jax, performed a sniff around the exterior of the vehicle.   K-9 Jax is a narcotics detection K-9, certified via USK9 Unlimited, NNDDA, and USPCA.   K-9 Jax indicated a positive alert to a narcotics odor on the rear left gate on the vehicle by giving a final response by sitting.

17.    Upon the positive alert, TFO Green advised the driver and passenger of their Miranda rights.   After confirming their understanding, he further explained that a search would be conducted.   During the search, the officers found a heat-seal machine in a black bag on the rear floorboard.   When officers removed the storage cover, they saw the spare tire and observed a heat-sealed package of rubber-banded U.S. Currency next to the tire and a roll of saran wrap on top of the tire.   The U.S. Currency totaled $12,000.00.

18.    Leary and Buchanan were both asked about the currency, and both emphatically denied knowledge or ownership of it and stated that the cash must have been in the car when they rented it.   They both advised they saw the heat-seal machine in the car when they rented it but

didn't want to return the car, so they just kept the machine in the car.    The currency was seized

by the DEA.

20.    Based on his training and experience, TFO Green knows that narcotics traffickers

will often combine cash in heat-sealed packages and hide cash or monetary instruments within

innocuous items — all in an effort to remain undetected.

20.    The defendant property consisted of three hundred sixty-eight (368) bills totaling

$12,000 in U.S. Currency.    The denominations of the defendant currency were fifty (50) $100

bills, forty-two (42) $50 bills, two hundred twenty-three (223) $20 bills, thirty-five (35) $10 bills,

and eighteen (18) $5 bills.    Based on the above, seventy-five (75%) percent of the bills were $20

and below.

21.    Based on TFO Green's training and experience, and together with numerous factors

including the positive dog alert, the concealment of the large amount of rubber-banded cash in a

heat-sealed package, the high percentage of low denomination bills, the length and quick duration

of the trip, the car occupants' nervous behavior, and the occupants' contrasting stories, the

defendant property is consistent with the proceeds of narcotics trafficking.

## LAW

22.    21 U.S.C. § 881(a)(6) provides that the following shall be subject to forfeiture to

the United States:

> "All moneys, negotiable instruments, securities, or other things of value furnished
> or intended to be furnished by any person in exchange for a controlled substance or
> listed chemical in violation of this subchapter, all proceeds traceable to such an
> exchange, and all moneys, negotiable instruments, and securities used or intended
> to be used to facilitate any violation of this subchapter."

**BASIS FOR FORFEITURE**

23.     The defendant property is subject to forfeiture, pursuant to 21 U.S.C. § 881(a)(6),

because it represents moneys furnished or intended to be furnished in exchange for a controlled

substance, or proceeds traceable to such an exchange, or moneys used or intended to be used to

facilitate a drug offense, in violation of the Controlled Substances Act, 21 U.S.C. § 841 *et seq*.

**CLAIM FOR RELIEF**

24.     Based on the facts set forth and incorporated herein, the defendant property should

be properly condemned and forfeited to the United States of America pursuant to 18 U.S.C.

§ 881(a)(6).

WHEREFORE, the plaintiff requests that the Court issue a warrant and summons for the

arrest and seizure of the defendant property; that notice of this action be given to all persons known

or thought to have an interest in or right against the defendant property; that the defendant property

be forfeited and condemned to the United States of America; that the plaintiff be awarded its costs

and disbursements in this action; and that the Court award the plaintiff such other and further relief

as this Court deems proper and just.

UNITED STATES OF AMERICA, by

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY


/s/ J. Brady Casey
J. Brady Casey, LBN: 24338
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
E-mail: john.casey@usdoj.gov


/s/ Monica Griffith-Braud
Monica Griffith-Braud, LBN: 33162
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
E-mail: monica.griffith-braud@usdoj.gov

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

IN RE:                                        :
                                              :
IN THE MATTER OF                              :            CIVIL ACTION NO. 22-CV
$12,000.00 U.S. CURRENCY                      :

## VERIFICATION

I, Jason Dohm, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint In Rem and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except that those matters not within my own personal knowledge are alleged on information and belief, and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with other officers, as a Task Force Officer with the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated this 15 day of February, 2022.

JASON DOHM
Drug Enforcement Administration

9